**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
        jglatt@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (*pro hac vice* forthcoming)
Benjamin Rozenshteyn (*pro hac vice* forthcoming)
140 Broadway, Suite 4667
New York, NY 10005
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-mail: adrian@gr-firm.com
        ben@gr-firm.com

*Attorneys for Plaintiff Kristin Cobbs*

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
Marie A. McCrary (State Bar No. 262670)
Anthony J. Patek (State Bar No. 228964)
100 Pine Street, Suite 1250
San Francisco, CA 94111
E-mail: seth@gutridesafier.com
        marie@gutridesafier.com
        anthony@gutridesafier.com

*Attorneys for Plaintiffs Carol Lesh and Sarah Coleman*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re VNGR BEVERAGE, LLC LITIGATION<br><br><br><br><br>This Document Relates To:<br>Case No. 4:24-cv-04396-HSG | Case No. 4:24-cv-03229-HSG<br><br>CLASS ACTION<br><br>**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Haywood S. Gilliam, Jr.<br>Courtroom: 2 |

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT—JURY TRIAL DEMANDED
CASE NO. 4:24-cv-03229-HSG

Plaintiffs Kristin Cobbs, Carol Lesh, Sarah Coleman, and Megan Wheeler ("Plaintiffs") bring this action individually on behalf of themselves, on behalf of the general public, and all others similarly situated against VNGR Beverage LLC d/b/a Poppi ("Defendant").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on their personal knowledge.

**NATURE OF THE ACTION**

1.　　Plaintiffs bring this class action on behalf of themselves as individuals, the general public, and similarly situated consumers who purchased Poppi "Prebiotic Soda" ("Poppi," "Poppi Soda," or the "Products").[1]

2.　　Poppi Soda has quickly climbed the ranks as one of the most popular beverages in the United States.  Founded in 2016, Poppi began as a healthy alternative to traditional sodas, combining healthy ingredients and juices, with an emphasis on apple cider vinegar.  From its humble beginnings at farmers' markets, the Products' popularity sky-rocketed in 2018 after being featured on Shark Tank.[2]  Following a dynamic rebranding, Poppi Soda was introduced into Whole Foods Market, igniting a surge in growth that reached its zenith in a Super Bowl advertisement in 2024 where Defendant proudly announced Poppi as "the future of soda."[3] As of 2024, Poppi's

---

[1] The Poppi Sodas include all of the flavors and can sizes offered throughout the Class Period, including Orange Cream, Lemon Lime, Strawberry Lemon, Orange, Doc Pop, Ginger Lime, Raspberry Rose, Grape, Blueberry Sage, Grapefruit, Pineapple Mango, Pineapple Turmeric, Cranberry Fizz, Cherry Limeade, Wild Berry, Watermelon, Classic Cola, and Root Beer.

[2] Nelson Ayers, *Was Poppi on Shark Tank? A Detailed Look at the Prebiotic Soda Brand's Appearance and Success*, 33 SQUARE (Sept. 30, 2023), *available* https://www.33rdsquare.com/was-poppi-on-shark-tank-a-detailed-look-at-the-prebiotic-soda-brands-appearance-and-success/ (last accessed May 16, 2024).

[3] Daily Commercials, *Poppi Super Bowl 2024 Ad – The Future of Soda is Now,* (Feb. 11, 2024) *available* https://dailycommercials.com/poppi-super-bowl-2024-ad-the-future-of-soda-is-now/ (last accessed May 16, 2024).

sales figures have topped $100 million dollars and continue to grow,[4] representing 19% of the US market share and even surpassing Coke by 1.5 times.[5]

3.　　　Defendant's success is largely owed to its ability to preserve the flavor and sweetness of traditional sodas while claiming to be "gut healthy" due to its inclusion of "prebiotic" fiber—a specific type of dietary fiber commonly found in food like bananas and whole grains that purportedly supports the growth of beneficial microorganisms in the gut.  However, Defendant's Poppi Soda only contains **two grams of fiber**, an amount too low to cause any meaningful gut health benefits or even considered a "fortified" or "good source" of fiber, in contravention of FDA regulations.  Accordingly, a consumer would need to drink **more than four Poppi Sodas in a day** to realize any potential gut health benefits from Poppi's prebiotic fiber.  However, even if a consumer were to do that, Poppi's high sugar content would offset most, if not all, of those gut health benefits.

4.　　　In addition, the main source of the Poppi Soda's prebiotic fiber is agave inulin: a type of prebiotic fiber that is less effective than other prebiotic fibers at promoting gut health and has been linked to adverse effects such as bloating, abdominal pain, and even liver damage.

5.　　　In sum, despite Defendant's alluring "prebiotic" marketing claims, which assure consumers, on the can, that they can "Be Gut Happy [and] Be Gut Healthy," as one nutritionist bluntly explained: the Products "are basically sugared water,"[6] which has been shown to actually harm gut health.

---

[4] Christopher Doering, *Healthy Soda Brand Poppi Denies Being M&A Target of Large Beverage Companies,* RETAIL DIVE (May 3, 2024), *available* https://www.retaildive.com/news/healthy-soda-brand-poppi-denies-acquisition-target-coca-cola/715080/ (last accessed May 16, 2024).

[5] Yola Robert, *How Poppie is Reshaping Soda Culture for Gen Z and Millennials,* FORBES (Mar. 5, 2024), *available* https://www.forbes.com/sites/yolarobert1/2024/03/05/how-poppi-is-reshaping-soda-culture-for-gen-z-and-millennials/?sh=473c08f47466 (last accessed May 16, 2024).

[6] Korin Miller, *Poppie's Super Bowl Ad Raises Questions About Prebiotic Soda.  What Do These Beverages Do?* YAHOO! LIFE (Feb. 12, 2024) *available* https://www.yahoo.com/lifestyle/poppis-super-bowl-ad-raises-questions-about-prebiotic-soda-what-do-these-beverages-do-194722830.html (last accessed May 16, 2024).

6.    Accordingly, Plaintiffs bring claims against Defendant on behalf of themselves and a proposed class of all others similarly situated for violations of state consumer protection laws and unjust enrichment.

## PARTIES

7.    Plaintiff Kristin Cobbs is, and at all times alleged in this Class Action Complaint was, a citizen of California, residing in San Francisco, California.

8.    Plaintiff Carol Lesh is, and at all times alleged in this Class Action Complaint was, a citizen of California and resident of Berkeley, California.

9.    Plaintiff Sarah Coleman is, and at all times alleged in this Class Action Complaint was a citizen of California and a resident of Sacramento, California.

10.    Plaintiff Megan Wheeler is, and at all times alleged in this Complaint was, a citizen of California.

11.    Defendant VNGR Beverage LLC, is a Texas limited liability corporation with its principal place of business located at 31 Navasota Street Suite 270 Austin, Texas.  Defendant manufactures, markets, and sells the Products throughout California and the United States.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A)-(C) because this case is a class action where the aggregate claims of all members of the proposed Classes are in excess of $5,000,000.00 exclusive of interest and costs, and Plaintiffs are citizens of states different from Defendant.

13.    This Court also has personal jurisdiction over Defendant because it conducts and transacts business in the state of California, including this District, such as entering into contracts to supply goods within this District.  Furthermore, a substantial portion of the events giving rise to Plaintiffs' claims occurred in this District, including Plaintiffs Cobbs' and Lesh's purchases.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant conducts substantial business in this District and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

**FACTUAL ALLEGATIONS**

**I.    Poppi's Prebiotic and Gut Health Representations**

15.    Defendant manufactures, markets, and sells its "prebiotic" Poppi Sodas online and in grocery stores throughout California and the United States. Throughout the Class Period, Defendant has represented on the Poppi labels and through online marketing that the Products contain prebiotics and that consuming the Products leads to gut health benefits.

16.    As depicted below, Defendant conspicuously represents on the Products' cans that Poppi is a "**Prebiotic Soda**" made "**For a Healthy Gut**."  These representations are reinforced by the slogan "**Be Gut Happy.  Be Gut Healthy.**"  This is accompanied by side label claims and vignettes representing that the Products have **"Prebiotics for a Healthy Gut."**  Cumulatively, these claims are referred to as the "Prebiotic Representations."

[Intentionally Left Blank]





17.     Defendant furthers these misrepresentations by touting the benefits of including prebiotics on its website in iterations:

June 2020 – October 2023:[7]

> Wanna stay healthy? **Listen to your gut. 70% of your body's immunity begins with your gut**, so we made it fun and easy to **get the prebiotics your body needs** and boost your immunity at the source.

> Helps (Changed to "May" in 2022) Aid Digestion
> Like all living things, probiotics need food in order to grow and thrive. We all have probiotics naturally occurring in our bodies, and **prebiotics are a type of fiber our probiotics consume**, giving them the fuel they need to do what they do best. **In other words, prebiotics + probiotics = a happy healthy gut**.

October 2023 – July 2024:[8]

> Why Poppi? Soda's back. We're bringing soda back. The twist? **It's better for you this time.** No more hiding cans in the bottom of your recycling bin or sipping sparkling water with your burger and fries. You deserve that mouth-watering swirl of flavors and bubbles without feeling bad about it! Get all the soda feels with 5g sugar and 25 calories, or less, **and prebiotics**. Remember: cravings aren't a crime, people! It's time to love soda again. Like right now!"

> what fiber sources are in poppi?
> poppi uses Organic Agave Inulin, which is extracted from agave plants and provides a neutral, naturally sweet taste. **Inulin is a prebiotic fiber that may support gut health by diversifying the gut microbiome** and providing fuel for good bacteria, particularly Bifidobacteria and Lactobacilli.

---

[7] Drinkpoppi.com, *Be Gut Happy, Be Gut Healthy*, available https://web.archive.org/web/20230207190214/https://www.drinkpoppi.com/why-poppi/ (last accessed July 18, 2024) (emphasis added).

[8] Drinkpoppi.com, *Soda's Back*, available https://drinkpoppi.com/pages/benefits-101 (last accessed July 18, 2024) (emphasis added).

18.    Defendant's Amazon sales page makes similar prebiotic presentations:





19.    Defendant also engaged in a pervasive social media campaign throughout the Class Period, reinforcing the message that by consuming the prebiotics found in the Poppi Sodas, consumers could attain tangible gut health benefits, as shown by its official TikTok and Instagram pages.  Below is a mere sampling of Defendant's advertisements:

[Intentionally Left Blank]

**Defendant's Official TikTok Page:**








**Defendant's Official Instagram Page:**



20.    As noted above, Defendant's pervasive marketing over the last 3 years evinces Defendant's intent to lead consumers to believe that consuming its Poppi Sodas prebiotics would directly improve their gut health.  In fact, Defendant defines "prebiotic" on its website to mean "a special type of fiber that can act as food for healthy bacteria in your gut."  This definition parallels the generally accepted definition of "prebiotic" within the medical community.[9]  Defendant's

[9] *See, e.g.,* K. Zeratsky, R.D., L.D., *What Are Probiotics and Prebiotics?*, Mayo Clinic website,

Prebiotic Representations demonstrate that Defendant intends for consumers (who do not typically have knowledge of prebiotic content, fiber, and the effects of added sugar) to purchase the Products for the claimed health and gut benefits.

21.     Despite Defendant's Prebiotic Representations, however, the Products do not provide meaningful prebiotic effects, as discussed in greater detail below.  Because ordinary consumers do not have expertise in pre- and probiotic science, they purchase, and continue to purchase, Defendant's Products under the erroneous but reasonable belief that the Products are providing prebiotic gut benefits due to Poppi's false and misleading Prebiotic Representations.

22.     Finally, by prominently labeling the Products as "Prebiotic," Defendant is effectively labeling the Products as a good source or fortified source of "fiber," using alternative words that communicate that meaning, in contravention of FDA regulations.

## II.     Consumer Demand for "Healthy" Food and Beverages

23.     Many American consumers are health conscious and seek foods and beverages to that end.  Accordingly, consumers routinely take product label claims into consideration in selecting and purchasing food items.  In fact, consumer research from Neilsen found that "Consumer demand for products that support their health and wellness is on the rise, and many beverage brands are filling that need.  According to NIQ's 2023 Consumer Outlook, 46% of consumers identified physical or mental wellness as one of their top priorities in 2023."[10]

24.     As such, Defendant's founders sought to exploit this demand with the Products.  For example, Poppi's co-founder, Allison Ellsworth, stated in an interview: "I was interested in what food does for your body as medicine versus going the traditional route."[11]  Likewise, Poppi's other

---

*Nutrition & Healthy Eating*, available at https://www.mayoclinic.org/healthy-lifestyle/nutritionand-healthy-eating/expert-answers/probiotics/faq-20058065 (accessed June 13, 2024). ("Prebiotics are foods (typically high-fiber foods) that act as food for human microflora.").

[10] NIQ, *The Future of Beverages: Sustainable Practices and Wellness,* NEILSEN CONSUMER (Dec. 4, 2023), *available* https://nielseniq.com/global/en/insights/education/2023/the-future-of-beverages-sustainable-practices- and-wellness/#:~:text=Wellness%2DFocused%20Beverages%3A%20A%20Growing,their%20top%20priorities%20in%202023 (last accessed June 13, 2024).

[11] Simon Mainwaring, *Purpose At Work: How Poppi Leverages Purpose To Bring Health to Soda,* FORBES (Mar. 15, 2021) *available* https://www.forbes.com/sites/simonmainwaring/2021/03/15/purpose-at-work-how-poppi-leverages-purpose-to-bring-health-to-

---

co-founder, Stephen Ellsworth, said "We plan to really democratize healthy soda."[12]

## III.    Overview of Prebiotics and Agave Inulin

25.    "Prebiotics" are a type of dietary fiber that stimulates the growth of healthy bacteria in the gut.  These bacteria are known as probiotics.[13]  Instead of being digested by the body, these prebiotic fibers travel to the large intestine, where they promote the growth of healthy gut bacteria that help aid digestion and regulate the immune system.[14]

26.    "Prebiotic" sodas are fortified with fiber.  Scientists recognize prebiotic sodas as a form of fiber-fortified food.

27.    "Inulin" is a class of fructose polymers with common elements but differing overall structures.  All inulin consists of repeating linear fructosyl subunits, with linkages between the second carbon of one fructose and first carbon of the next fructose (referred to as a β-2,1 linkage), ending with a glucosyl subunit.  But inulin from different sources varies in length, and some types of inulin include branches in addition to linear subunits.  In addition to the linear fructose chains common to all inulin, agave inulin includes branched fructose chains connected via the sixth carbon of some fructoses.  In comparison, chicory inulin is purely linear.  Because their structures vary, inulin from different sources can have different biological effects.  Most studies of the prebiotic effects of inulin use either short chain inulin (<10 units) or long chain, linear inulin.

28.    Poppi claims to be a prebiotic soda due to its inclusion of agave inulin, a type of natural soluble fiber extracted from the agave plant that may function as a prebiotic.[15]  Although

soda/#:~:text=The%20company%20packs%20prebiotic%20health,Allison%20Ellsworth%2C%20t ells%20We%20First. (last accessed June 13, 2024).

[12] *Id.*

[13] Barbara Bolen, Ph.D., *What are Prebiotics?*, VERYWELL HEALTH (Mar. 23, 2024) *available* https://www.verywellhealth.com/prebiotics-and-ibs-1944748 (last accessed May 16, 2024).

[14] Ospina-Corral Sebastián, et al., *Prebiotics in Beverages: From Health Impact to Preservation*, A. Grumezescu, A. Holban, Preservatives and Preservation Approaches in Beverages, Pages 339-373 (Academic Press 2019) ("The consumption of foods and beverages containing added nutrients and fortification, including functional prebiotics is a current global consumer trend."

[15] Although the Products also contain apple cider vinegar ("AVC") experts largely agree that that ingredient does not function as prebiotic in food products.  *See* Janet Helm, MS, RDN, *Apple Cider Vinega: Myths vs. Facts,* U.S. NEWS & WORLD REPORTS (May 4, 2023) *available* https://health.usnews.com/wellness/food/articles/apple-cider-vinegar-benefits.  Nor does Defendant claim to derive its prebiotics from that ingredient.  *See* Poppi,

fibers like agave inulin may sound exotic and unique, most adults are able to consume enough prebiotics through a variety of regular foods, including, "whole grains, bananas, greens, onions, garlic, soybeans and artichokes."[16] Indeed, experts recommend that people consume their prebiotics from these fiber-rich foods instead of dietary supplements (like agave inulin) because "consumption of a singular fiber type restricts the nutritional support available to our microbiome, and can limit overall diversity that is crucial for a healthy microbiome."[17]

29.    Critically, consuming too much inulin can lead to adverse health results. Studies show that taking as little as 2.5 grams of prebiotic supplements, including agave inulin, can lead to a build-up of gas, causing abdominal discomfort, while higher doses (40-50 grams per day) can lead to diarrhea.[18] This is particularly problematic for people with existing digestive issues like irritable bowel syndrome or dietary sensitivities.[19]

30.    These findings are supported by other studies that show additional negative health implications of consuming too much agave inulin. For instance, a recent study found that consuming agave inulin over a long time period can significantly alter the gut's microenvironment, leading to immune system disruptions.[20] Another study found that an inulin based diet can lead to inflammation and even liver damage at doses as small as 10 to 30 grams *per day* over a 3-week

https://drinkpoppi.com/pages/benefits-101 ("Each can of poppi includes agave inulin, a prebiotic (and natural sweetener!) extracted from the agave tequilana plant.").

[16] Katherine Zeratsky, R.D., L.D., *What Are Probiotics and Prebiotics?* MAYO CLINIC (July 2, 2022), *available* https://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-eating/expert-answers/probiotics/faq-20058065 (last accessed May 16, 2024).

[17] Maya Shetty, BS, *Probiotics, Prebiotics, and Postbiotics: What Are They and Why Are They Important?* STANFORD UNIV.: LIFESTYLE MEDICINE (Apr. 8, 2024) *available* https://longevity.stanford.edu/lifestyle/2024/04/08/probiotics-prebiotics-and-postbiotics-what-are-they-and-why-are-they-important/ (last accessed May 16, 2024).

[18] Michele Pier Luca Guarino, *et al. Mechanisms of Action of Prebiotics and Their Effects on Gastro-Intestinal Disorders in Adults*, NUTRIENTS, vol. 12:4, 1037-39 Apr. 2020, doi:10.3390/nu12041037; *see also* Holscher HD, et al., *Gastrointestinal tolerance and utilization of agave inulin by healthy adults*, FOOD FUNCT. 5(6):1142–9 (2014) (reporting increases in flatulence, bloating, and abdominal pain among healthy individuals ingesting agave inulin).

[19] Joey Conners, *Is Agave Inulin Bad for You?* IIBFY (Feb. 3, 2024), *available* https://www.isitbadforyou.com/questions/is-agave-inulin-bad-for-you (last accessed May 16, 2024).

[20] Renan Oliveira Corrêa, et al., *Inulin diet uncovers complex diet-microbiota-immune cell interactions remodeling the gut epithelium*. MICROBIOME, vol. 11,1 90. 26 Apr. 2023, *available* doi:10.1186/s40168-023-01520-2.

period.[21]  As summarized in a recent article by Weill Cornell Medicine, although "[i]nulin is now everywhere, from clinical trials to prebiotic sodas," a recent study found that "foods with added [inulin] fiber, stimulates microbes in the gut to release bile acids that increase the production of molecules that promote intestinal inflammation."[22]

31.    Moreover, existing research on the positive prebiotics effects of agave inulin found an absence of any "significant changes" on the few reliable markers of microbiome health, such as short-chain fatty acids ("SCFAs") and branched chain fatty acids ("BFCAs").[23]  In particular, a recent meta-study on the effects of various prebiotics based on clinical trials found that agave inulin had no meaningful impact on SCFAs or BFCAs, even when administered *at 7.5 grams per day* (the equivalent of almost four cans of Poppi Soda per day) over a period of three weeks.[24] Indeed, the authors of that particular study concluded that they "did not detect a significant treatment effect of agave inulin supplementation alone[.]"[25]

32.    These results are aligned with current research on the source and efficacy of different types of inulin.  Specifically, studies suggest that the straight, long chains of inulin, such as those found in chicory-sourced inulin are better for gut health than agave inulin, which has branched chains, making it less effective as a prebiotic.[26]  As one commentator noted, inulin is an example of a fiber that "can be chemically isolated and called a prebiotic, but . . . may or may not

[21] Samuel M. Lancaster, et al. *Global, distinctive, and personal changes in molecular and microbial profiles by specific fibers in humans*, CELL HOST & MICROBE vol. 30, 6 (2022): 848-862.e7, *available* doi:10.1016/j.chom. 2022.03.036.

[22] Weill Cornell Medicine, *Common Type of Fiber May Trigger Bowel Inflammation,* (May 13, 2024), *available* https://medicine.weill.cornell.edu/news/common-type-fiber-may-trigger-bowel-inflammation (last accessed May 16, 2024) (emphasis added).

[23] Valentina Vinelli, et al., *Effects of Dietary Fibers on Short-Chain Fatty Acids and Gut Microbiota Composition in Healthy Adults: A Systematic Review,* NUTRIENTS vol. 14,13 2559. 21 Jun. 2022, available doi:10.3390/nu14132559.

[24] *Id.*

[25] Hannah D. Holscher, et al., *Agave Inulin Supplementation Affects The Fecal Microbiota Of Healthy Adults Participating In A Randomized, Double-Blind, Placebo-Controlled, Crossover Trial*, THE J. OF NUTRITION 145.9 (2015): 2025-2032. available doi.: 10.3945/jn.115.21733.

[26] *See* Hughes, Riley L., David A. Alvarado, Kelly S. Swanson, and Hannah D. Holscher. *The prebiotic potential of inulin-type fructans: a systematic review*, ADVANCES IN NUTRITION 13, no. 2, 492-529 (2022).

fulfill all of the scientific criteria required of a prebiotic" under modern criteria.[27]

33.    Nutrition researchers examining the prebiotic properties of Poppi have arrived at the same conclusions.  Citing to the same author who concluded that inulin can lead to inflammation and liver damage (*supra* ¶ 30), a journalist from NPR indicated that "the purified fibers that are added to foods," such as Poppi, "get fermented faster, by microbes that live near where the small intestine meets the large intestine," meaning that they are unable to "reach the microbes living further down the large intestine"—where durable and reliable gut changes occur.[28]  Another dietitian stated that she does not recommend consuming the agave inulin found in sodas like Poppi because "not only can it cause a lot of gas, but it's not the same as an insoluble fiber."[29]  Likewise, in an article published by Healthline, a gut health expert indicated that she "can't see much benefit" to drinking prebiotic sodas like Poppi, explaining that agave inulin "is a common trigger for bloating and gas, particularly for those with a sensitive digestive system, or people with irritable bowel syndrome (IBS)."[30]  The article also emphasized that sodas like Poppi "have a high sugar content, which can contribute to heart disease, some cancers, type 2 diabetes, and being overweight."[31]

34.    Indeed, since the inception of this lawsuit, various health experts have corroborated the allegations contained herein.

35.    For instance, in one of many articles covering this action, a "board-certified emergency medicine physician and Integrative and Functional Medicine Practitioner" opined that "[t]wo grams of prebiotic fiber per can is quite low compared to the recommended daily intake of

---

[27] Floch, Martin; *Prebiotics and dietary fiber*, Nutritional care of the patient with gastrointestinal disease, 1st ed. Boca Raton, FL: Taylor & Francis Group, 89-110, at 91-92 (2015).

[28] NPR.org, *Prebiotic sodas promise to boost your gut health. Here's what to eat instead*, (August 8, 2023), *available* https://www.npr.org/sections/health-shots/2023/08/08/1192329196/gut-health-fiber-probiotic-olipop-poppi (last accessed May 20, 2024).

[29] Verywell Health, *Is There Such a Thing as Healthy Soda?*, (April 15, 2024), *available* https://www.verywellhealth.com/healthy-soda-is-it-actually-good-for-you-8630508 (last accessed May 20, 2024).

[30] Healthline, *Can Probiotic Soda Really Help Improve Your Gut Health?*, (May 20, 2024), *available* https://www.healthline.com/health-news/probiotic-soda-gut-health-benefits#Potential-risks-of-drinking-probiotic-and-prebiotic-sodas (last accessed May 20, 2024).

[31] *Id.*

---

dietary fiber, which is about 25 grams for women and 38 grams for men until the age of 51—then it's 21 for females and 30 for men, [w]hile two grams can contribute to your overall fiber intake, it's insufficient to produce significant gut health benefits."[32]

36.     Commenting on an article published by Healthline, a registered dietician specializing in gut health commented that "[p]roducts like Poppi [contain] just one type of prebiotic fiber, so it lacks that diversity that our guts need," and consuming Poppi "may actually lead to unwanted gut symptoms such as gas, bloating, and loose stools as too much inulin, which is the prebiotic fiber included here, can potentially cause symptoms[.]"[33]

37.     In yet another article, a New York State certified dietitian explained the misleading natures of Defendant's Prebiotic Representations from a dietary perspective[34]:

> My main gripe with these beverages is that the overwhelming marketing effort around gut health isn't providing a full picture of what it means to improve the health of intestinal microbiome through dietary patterns (we also need more polyphenols found in plant foods; more omega-3's found in plants & marine sources, and adequate vitamins A and D, for example) to create an optimized environment for carbohydrate fermentation in the GI tract and for the byproducts of that fermentation to thrive. So, simply by creating a prebiotic fiber to use as an additive in a food product can really only get us so far when compared to cultivating a pattern of eating that includes more food sources of prebiotic fiber and lean protein, healthy fats, and drinking unsweetened beverages, which appears to have much greater benefit for short and long-term GI health overall[.]

**IV.     Sugar-Sweetened Beverage Consumption is Harmful to Gut and Overall Health**

38.     Poppi Sodas are sweetened with both added sugar and stevia.  It is well-accepted in scientific literature that consumption of added sugar is harmful to the gut and overall health.

39.     Added sugar consumption detrimentally affects gut health in multiple ways.  First, dietary sugar affects the balance of microbiota in the gut by fostering the growth of harmful

---

[32] Samantha Holender, *Poppi's "Gut Healthy" Soda Might Not Be So "Gut Healthy" After All*, Marie Claire (June 4, 2024) *available* https://www.marieclaire.com/beauty/poppi-soda-lawsuit-explained/.

[33] Victoria Stokes, *Poppi Prebiotic Soda May Not Be as Good for Your Gut as It Claims,* HEALTHLINE (June 9, 2024), *available* https://www.healthline.com/health-news/poppi-prebiotic-soda-gut-health.

[34] Trish Clasen Marsanico, *Is Prebiotic Soda Good for Your Health? We Asked Experts,* PREVENTION (Jul 4, 2024), *available* https://www.prevention.com/food-nutrition/a61453944/is-prebiotic-soda-healthy/.

microbiota and decreasing the growth of beneficial microbiota.[35]  An overgrowth of harmful microbiota increases inflammation in the body, decreases immune system functionality, and increases gut permeability.[36]  This can lead to small intestinal bacterial overgrowth (SIBO),[37] where an abnormal amount of bacterial populates in the intestinal track, thereby slowing the passage of food and waste products in the digestive track, and risks causing diarrhea, weight loss, and malnutrition,[38] and Candida overgrowth,[39] a yeast overgrowth associated with high sugar diets.[40]

40.    Even a short-term exposure to a high sugar diet increases susceptibility to colitis by increasing gut permeability, and eventually, leaky gut.[41]  Leaky gut results in bacteria entering other parts of the body and perpetuating inflammatory bowel diseases.[42]

41.    Further, added sugar consumption overwhelms the pancreas and liver, leading to failure in its ability to properly regulate blood sugar.[43]  As a result, the liver will convert excess fructose to fat, which is stored in the liver and released into the bloodstream.  This process contributes to key elements of metabolic syndrome, including high blood fats and triglycerides, high cholesterol, high blood pressure, and extra body fat, especially in the belly.[44]  Metabolic

[35] Satokari, Reetta, *High Intake of Sugar and the Balance between Pro- and Anti-Inflammatory Gut Bacteria*, NUTRIENTS 2020, 12(5), 1348; https://doi.org/10.3390/nu12051348.

[36] *Id.*; *see also* Garcia, et al., *Impact of Dietary Sugars on Gut Microbiota and Metabolic Health*, DIABETOLOGY 2022, 3(4), 549-560; https://doi.org/10.3390/diabetology3040042.

[37] Satokari, Reetta, *supra* note 35.

[38] Mayo Clinic Staff, *Small Intestinal Bacterial Overgrowth (SIBO)*, Mayo Clinic (Jan. 6, 2022) *available* https://www.mayoclinic.org/diseases-conditions/small-intestinal-bacterial-overgrowth/symptoms-causes/syc-20370168.

[39] Satokari, Reetta, *supra* note 35.

[40] Mitchell Medical Group, *About Candida*, available https://www.mitchellmedicalgroup.com/services/candida/about-candida/ (last accessed July 18, 2024).

[41] Zhang, *Influence of Foods and Nutrition on the Gut Microbiome and Implications for Intestinal Health*, INT. J. MOL. SCI. 2022, 23(17), 9588; https://doi.org/10.3390/ijms23179588.

[42] *Id.*

[43] Gugliucci A., *Sugar and Dyslipidemia: A Double-Hit, Perfect Storm*, J. OF CLINICAL MED., 2023; 12(17):5660. https://doi.org/10.3390/jcm12175660.

[44] Te Morenga, L., et al., *Dietary sugars and body weight: systematic review and meta- analyses of randomized controlled trials and cohort studies*, BJM (January 2013); https://doi.org/10.1136/bmj.e7492.

disease has been linked to type 2 diabetes, cardiovascular disease, obesity, polycystic ovary syndrome, nonalcoholic fatty liver disease, and chronic kidney disease.  Higher consumption of sugar-sweetened beverages is significantly associated with elevated cardiometabolic risk scores, including lower HDL "good" cholesterol, and higher triglycerides.[45]

42.     Additionally, while non-nutritive sweeteners ("NNSs") such as stevia are not metabolized in the same way as sugar, recent research suggests that stevia and other NNSs carry an enhanced risk of glucose intolerance, insulin resistance, diabetes and increased weight.[46]

43.     Thus, Poppi's inclusion of 4 to 5 grams of sugar is especially problematic because, aside from posing health risks by itself, it harms gut bacteria, further underscoring the falsity of its Prebiotic Representations.  Indeed, as the registered dietitian previously quoted from the Healthline article covering this action further elaborated, Poppi's "excess sugar can harm gut bacteria, disrupting their delicate balance."[47]

## V.     Federal and State Regulations Governing Food Labeling

44.     The FDA has promulgated a separate set of regulations that govern nutrient content claims made on the front of a package.  21 C.F.R. § 101.13.  A nutrient content claim is a claim that "expressly or implicitly characterizes the level of a nutrient."  21 C.F.R. § 101.13(b). "Express" nutrient content claims include any statement outside the Nutrition Facts Panel about the level of a nutrient.  21 C.F.R. § 101.13(b)(1); 21 C.F.R. § 101.13(c).  Stating information from the nutrition facts panel (such as grams protein per serving) elsewhere on the package necessarily constitutes a nutrient content claim.  21 C.F.R. § 101.13(c).  A manufacturer cannot make a nutrient content claim in the form of a "statement about the amount or percentage of a nutrient" if the statement is "false or misleading in any respect."  21 C.F.R. § 101.13(i)(3).

45.     Under the FDA's "good source" nutrient content claim regulations, "the terms 'good

[45] *See, e.g.*, Jiawei Yin, et al., *Intake of Sugar-Sweetened and Low-Calorie Sweetened Beverages and Risk of Cardiovascular Disease: A Meta-Analysis and Systematic Review*, ADV. NUTRITION, Volume 12, Issue 1 (2021), Pages 89-101, https://doi.org/10.1093/advances/nmaa084; and Fried, et al., *Sugars, hypertriglyceridemia, and cardiovascular disease*, AM. J. CLINICAL NUTR. (October 2003), Pages 873S-880S; https://doi.org/10.1093/ajcn/78.4.873S.

[46] Garcia, et al., *supra*, at 549.

[47] *See* Victoria Stokes, *supra*, note 33.

source,' 'contains,' or 'provides' may be used on the label and in the labeling of foods . . . provided that the food contains 10 to 19 percent of the RDI or the DRV per reference amount customarily consumed." 21 C.F.R. § 101.54(c)(1).

46.    Under the FDA's "More" (*i.e.*, "fortified") nutrient content claim regulations, "[a] relative claim using the terms 'more,' 'fortified,' 'enriched,' 'added,' 'extra,' and 'plus' may be used on the label or in labeling of foods to describe the level of . . . dietary fiber," provided that it meets the requirements of 21 C.F.R. § 101.54(e)(1) or (2).

47.    Under § 101.54(e)(1), the food making the fortified fiber claim must "contain[] at least 10 percent more of the . . . DRV for . . . dietary fiber, . . . (expressed as a percent of the Daily Value) *per reference amount customarily consumed* than an appropriate reference food.  21 C.F.R. § 101.54(e)(1)(i).  If the fortified fiber claim is "based on a nutrient that has been added to the food," that fortification must be in accordance with the policy on fortification of foods in 21 C.F.R. § 104.20.  *See* 21 C.F.R. § 101.54(e)(1)(ii).  Finally, under 21 C.F.R. § 101.54(e)(1)(iii): (A) the identity of the reference food and the percentage (or fraction) that the nutrient is greater relative to the DRV must be declared "in immediate proximity to the most prominent such claim (e.g., contains 10 percent more of the Daily Value for fiber than white bread')"; and (B) quantitative information comparing the level of the nutrient in the product per labeled serving with that of the reference food that it replaces (e.g., 'Fiber content of white bread is 1 gram (g) per serving; (this product) 3.5 g per serving') must be declared adjacent to the most prominent claim or to the nutrition label. If the nutrition label is on the information panel, the quantitative information required by § 101.54(e)(1)(iii) may be located elsewhere on the information panel in accordance with § 101.2.

48.    Under 21 C.F.R. § 101.54(e)(2), a "fortified" fiber claim is permissible if it meets three requirements parallel to those of § 101.54(e)(1), but expressed *in relation to specific serving sizes*.  First, the labeled food must contain at least 10 percent more of the DRV for dietary fiber (expressed as a percent of the Daily Value) *per 100g* of an appropriate reference food.  21 C.F.R. § 101.54(e)(2)(i).  Second, it must comply with the fortification policy of § 104.20. 21 C.F.R. § 101.54(e)(2)(ii).  Third, it must disclose relative quantity information parallel to that required by

§ 101.54(e)(1)(iii) above, expressed *per unit weight* of appropriate reference food (e.g., "contains 10 percent more of the Daily Value for fiber *per 3 oz than does 'X brand of product'"*). 21 C.F.R. § 101.54(e)(2)(iii).

49.     Similarly, 21 C.F.R. § 101.65(d)(2) provides that manufacturers "may use the term 'healthy' . . . as an implied nutrient content claim on the label or in labeling of a food that is useful in creating a diet that is consistent with dietary recommendations if" the requirements of 21 C.F.R. § 101.65(d)(2)(i)-(iv) are satisfied. 21 C.F.R. § 101.65(d)(2)(i)(F) requires that "[a]t least 10 percent of the RDI or the DRV per RA of one or more of vitamin A, vitamin C, calcium, iron, protein or fiber."

50.     Additionally, the FDA has recently published a proposed rule in which it scrutinizes products that contain added sugar, thereby "add[ing] calories without contributing essential nutrients." 87 FR 59168-01, at 59180. For this reason, the FDA recommends prohibiting Products with more than 5% DV of added sugars (*i.e.,* 2.5 grams of sugar) from making a "healthy" claim. *Id*.

51.     Most of the flavors of the Products each have more than 2.5 grams of added sugar and thus exceed the FDA's proposed threshold for "healthy" claims.

52.     Identical federal and California laws regulate the content of labels on packaged food and require truthful, accurate information on the labels of packaged foods. The requirements of the Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. §§ 101 and 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, no state imposes different requirements on the labeling of packaged food for sale in the United States.

53.     Under both the Sherman Law and FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on

its label or in its labeling.  California Health & Safety Code § 110660; 21 U.S.C. § 343(a).

54.    Under the FDCA, the term *false* has its usual meaning of "untruthful," while the term *misleading* is a term of art that covers labels that are technically true, but are likely to deceive consumers.  Under the FDCA, if any single representation on the labeling is false or misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

55.    In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations.  *See* California Health & Safety Code § 110660 (misbranded if label is false and misleading); California Health & Safety Code § 110705 (misbranded if words, statements and other information required by the Sherman Law are either missing or not sufficiently conspicuous); and California Health & Safety Code § 110740 (misbranded if contains artificial flavoring, artificial coloring and chemical preservatives but fails to adequately disclose that fact on label).

56.    Under California law, a food product that is "misbranded" cannot legally be manufactured, advertised, distributed, sold, or possessed. Misbranded products have no economic value and are legally worthless.

**VI.    Defendant's Prebiotic Representations Violate FDA Regulations**

57.    Representing that a soft drink is "For A Healthy Gut"; "Be Gut Happy. Be Gut Healthy."; "Prebiotics For A Healthy Gut;" and a "Prebiotic Soda" are all statements of fact, the use of which is limited by the aforementioned misbranding laws and regulations.

58.    Labeling the Products as "Prebiotic" is tantamount to labeling them as a "good source" of fiber and/or "fortified" with fiber.  As such the Products are, or should be, subject to the same regulations as nutrient content claims for fiber, and are misbranded to the extent they imply they are good or fortified sources of fiber without actually being so (*e.g.*, without actually providing 10% or more per serving of the DV for fiber), or without providing all the necessary information to support those claims (*e.g.*, failing to identify the increase in fiber they offer relative to an appropriate reference food).

59. Defendant made its unlawful nutrient claims by prominently claiming to be "Gut Healthy" and capable of promoting a "Healthy Gut" on the Products' front labels and packaging, without meeting the requirements of 21 C.F.R. §§ 101.65(d)(2).  Specifically, the Products fail to contain "[a]t least 10 percent of the RDI or the DRV per RA of one or more of vitamin A, vitamin C, calcium, iron, protein or fiber." 21 § 101.65(d)(2)(i)(F).  As noted above, Poppi does not have 10% of the RDI or DRV for dietary fiber (currently set at 2.8g).

60. Defendant has a duty to ensure the Products comply with applicable labelling regulations, including those above.

61. Even if the Products do not violate the letter of the FDA's fiber nutrient content claim regulations, they violate the policies those regulations embody.

## VII.   Defendant's Prebiotic Representations Are False and Misleading

62. Despite representing that Poppi is a "Prebiotic Soda" made "For a Healthy Gut," the Products fail to live up to these promises.  Specifically, the Products contain, *at most*, 2 grams of prebiotics from agave inulin dietary fiber, as listed on their nutrition facts panel.[48]  As discussed above, researchers have found that even as much as 7.5 grams of agave inulin taken daily for three weeks is insufficient to confer any meaningful prebiotic benefits.[49]  As a consequence, a consumer would need to drink **more than four** Poppi sodas daily *for 21 consecutive days* before potentially noticing any meaningful and reliable "prebiotic" effects.[50]

63. However, consumption at this rate would negate any prebiotic benefits.  First, consuming four or more Poppi sodas daily to gain prebiotic benefits has the potential to cause cramps, liver damage, and diarrhea.[51]  Second, and most critically, "[h]igh-sugar diets have been linked to higher levels of inflammation, especially for sugars like high-fructose corn syrup.  This inflammation can irritate the gut, damaging the protective mucus layer and decreasing the amount

---

[48] By way of comparison, Olipop, the Defendant's main competitor, contains 2 grams of sugar and 9 grams of dietary fiber.

[49] *See supra*, ¶¶ 20-32.

[50] *Id.*

[51] *See supra*, ¶¶ 29-30.

of good bacteria."[52]  And "[a]lthough organic cane sugar is less processed than table sugar, it still carried the same damaging effects that too much sugar has on your body and is not beneficial to your microbiome."[53]  Accordingly, to reach the 7.5-gram-fiber threshold, a consumer would also drink 20 grams of sugar daily for 21 days, or 420 grams of Defendant's cane sugar.  This means that even consuming enough Poppi sodas to see a beneficial prebiotic effect would require consuming enough sugar to offset those benefits.

64.     Plaintiffs and Class Members would not have purchased the Products on the same terms had they known the truth about Poppi.

65.     Nowhere on the Products packaging, labels, or advertisements does Defendant disclose the number of Poppi's that consumers would need to purchase before noticing any changes to their microbiome or the attendant risks of doing so.

66.     Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiffs and Class Members the true standard, quality, and grade of the Products and to disclose that the Products may contain substances known to have adverse health effects.  Defendant, as the manufacturer, or party to a contract to manufacture, thereby providing and approving marketing designs and the Products' formulations, and as the seller and advertiser of the Products, is best situated to know the content of its Products.  Nonetheless, Defendant concealed and affirmatively misrepresented the true nature of the Products, as discussed herein.

67.     Consumers lack the expertise to ascertain the true ingredients of an effective "prebiotic" prior to purchase.

68.     Absent careful scientific research regarding the health properties of agave inulin, and given Defendant's failure to disclose those risks, consumers such as Plaintiffs and the Class

[52] Jessica Bell, M.S., R.D., *The Worst Food for Gut Health, According to a Dietitian*, EATING WELL (Nov. 6, 2020) *available* https://www.eatingwell.com/article/7871982/worst-food-for-gut-health/ (last accessed May 17, 2024).

[53] B-Fine Foods, *5 Ingredients to Avoid (Or Your Gut May Go Crazy!)*, (Jan. 20, 2023), *available* https://b-finefoods.com/blogs/resources/5-hidden-ingredients-in-your-snacks-that-cause-gut-issues#:~:text=Although%20organic%20cane%20sugar%20is,t%20all%20that%20good%20ever (last accessed May 17, 2024).

Members were unable to determine that Poppi not only failed to provide "prebiotic" gut health benefits, but also posed digestive and liver issues while likely counteracting any prebiotic benefits because of its sugar content, when consumed regularly.

69. Accordingly, reasonable consumers must, and do, rely on Defendant to accurately and honestly advertise the Products' benefits. Further, consumers rely on Defendant to not contradict the Prebiotic Representations by including ingredients that could counteract its represented benefits and that which pose a risk to human health (*e.g.,* cane sugar and agave inulin). Such misrepresentations are material to reasonable consumers' purchasing decisions.

70. Consumer reliance upon Defendant's representations and omissions was reasonable and foreseeable as Defendant's Prebiotics Representations, as advertised, are material to reasonable consumers.

71. Accordingly, Plaintiffs and Class Members suffered economic injuries as a result of purchasing the Product.

**VIII.  Defendant Intends to Continue to Market the Products as Supporting Gut Health, and Knows that the Products Are Not Good Sources of Fiber**

72. Because consumers pay a price premium for products that contain prebiotics and offer gut health benefits, Defendant is able to both increase its sales and retain more profits by labeling its Products as improving gut health. Since this premium is based on the presence of putatively prebiotic fiber, Defendant knows that it is marketing the Products as a good source of fiber.

73. Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of the Products while decreasing the sales of competitors' products that are not unlawfully labeled, and/or (ii) commanding a higher price for the Products because consumers will pay more for them due to consumers' demand for beneficial prebiotic products.

74. Defendant continues to launch new flavors and diversify its portfolio to maintain its competitive edge, making it likely that Defendant will continue to misleadingly advertise the Products to perpetuate the misrepresentations regarding the gut health benefits of the Products.

## IX.    Plaintiff Experiences

### KRISTIN COBBS

75.    Plaintiff Cobbs purchased Defendant's Products for her personal use on multiple occasions throughout the statute of limitations period, with her last purchase occurring in or about March 2024.  Ms. Cobbs made these purchases from local grocery stores and online from her home in San Francisco, California.

76.    Prior to making her purchases, Plaintiff Cobbs saw that the Products were labeled and marketed as a "Prebiotic Soda" made "For a Healthy Gut," along with the slogan "Be Gut Happy. Be Gut Healthy" and side label claims and vignettes representing that the Products have "Prebiotics for a Healthy Gut."  Ms. Cobbs saw those representations prior to and at the time of her purchases and understood them as representations and warranties that the Products contained "prebiotics" that would make her "gut healthy."  Thus, Plaintiff Cobbs reasonably relied on Defendant's representations when she decided to purchase the Products.

77.    Accordingly, those representations and warranties were part of the basis of her bargains, in that Ms. Cobbs would not have purchased the Products on the same terms had she known that those representations were not true.

78.    Ms. Cobbs, however, did not receive the benefit of her bargains because the Products did not, in fact, contain enough "prebiotics" to achieve any meaningful "gut health." As a result of Defendant's misrepresentations and omissions, Plaintiff Cobbs paid more money for the Products than she would have paid for other or a similar soda product that was not unlawfully labeled and was induced to purchase the Products because of the unlawful and misleading labeling. Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff Cobbs would not have purchased them or, at minimum, would have paid less for them.

79.    Likewise, Ms. Cobbs was unaware that excessive consumption of the Products could negatively impact her health.  Had Ms. Cobbs known that Defendant's representations and warranties about the Products were false, she would not have purchased the Products or would have paid substantially less for them.

80.    Plaintiff Cobbs continues to desire to purchase soda products, including those marketed and sold by Defendant.  If the Products were reformulated and/or labeled without the unlawful and misleading claims, Plaintiff Cobbs would likely purchase the Products again in the future.  Plaintiff Cobbs regularly visits stores where the Products and other sodas are sold.

**CAROL LESH**

81.    Plaintiff Lesh purchased Defendant's Products for her personal use on multiple occasions throughout the statute of limitations period, with her last purchase occurring in or about July 2023.

82.    Prior to making her purchases, Plaintiff Lesh saw that the Products were labeled and marketed as a "prebiotic soda" made "For A Healthy Gut" along with the slogan "Be Gut Happy. Be Gut Healthy."  Plaintiff Lesh saw those representations prior to and at the time of her purchases and understood them as representations and warranties that the Products contained "prebiotics" that would make her "gut healthy."  Thus, Plaintiff Lesh reasonably relied on Defendant's representations when she decided to purchase the Products.

83.    Accordingly, those representations and warranties were part of the basis of her bargains, in that Ms. Lesh would not have purchased the Products on the same terms had she known that those representations were not true.

84.    Ms. Lesh, however, did not receive the benefit of her bargains because the Products did not, in fact, contain enough "prebiotics" to achieve any meaningful "gut health."  As a result of Defendant's misrepresentations and omissions, Plaintiff Lesh paid more money for the Products than she would have paid for other or a similar soda product that was not unlawfully labeled and was induced to purchase the Products because of the unlawful and misleading labeling.  Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff Lesh would not have purchased them or, at minimum, would have paid less for them.

85.    Plaintiff Lesh continues to desire to purchase soda products, including those marketed and sold by Defendant.  If the Products were reformulated and/or labeled without these unlawful and misleading claims, Plaintiff Lesh would likely purchase the Products again in the future.  Plaintiff Lesh regularly visits stores where the Products and other sodas are sold.

**SARAH COLEMAN**

86.     Plaintiff Coleman purchased Defendant's Products for her personal use on multiple occasions throughout the statute of limitations period.  Ms. Coleman made these purchases from local grocery stores in or around Sacramento, California.

87.     Prior to making her purchases, Plaintiff Coleman saw that the Products were labeled and marketed as a "Prebiotic Soda" made "For a Healthy Gut," along with the slogan "Be Gut Happy. Be Gut Healthy" and side label claims and vignettes representing that the Products have "Prebiotics for a Healthy Gut."  Ms. Cobbs saw those representations prior to and at the time of her purchases and understood them as representations and warranties that the Products contained "prebiotics" that would make her "gut healthy."  Thus, Plaintiff Coleman reasonably relied on Defendant's representations when she decided to purchase the Products.

88.     Accordingly, those representations and warranties were part of the basis of her bargains, in that Ms. Coleman would not have purchased the Products on the same terms had she known that those representations were not true.

89.     Ms. Coleman, however, did not receive the benefit of her bargains because the Products did not, in fact, contain enough "prebiotics" to achieve any meaningful "gut health."  As a result of Defendant's misrepresentations and omissions, Plaintiff Coleman paid more money for the Products than she would have paid for other or a similar soda product that was not unlawfully labeled and was induced to purchase the Products because of the unlawful and misleading labeling. Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff Coleman would not have purchased them or, at minimum, would have paid less for them.

90.     Plaintiff Coleman continues to desire to purchase soda products, including those marketed and sold by Defendant.  If the Products were reformulated and/or labeled without these unlawful and misleading claims, Plaintiff Coleman would likely purchase the Products again in the future.  Plaintiff Coleman regularly visits stores where the Products and other sodas are sold.

**MEGAN WHEELER**

91.    Ms. Wheeler purchased Defendant's Products for her personal use approximately three times per month over the last several months.  Ms. Wheeler made these purchases from a local Target in California.

92.    Prior to making her purchases, Plaintiff Wheeler saw that the Products were labeled and marketed "For a Healthy Gut" and that they contained "Prebiotics for a Healthy Gut."  Ms. Wheeler saw those representations and warranties prior to and at the time of purchase and understood them as representations and warranties that the Products contained "prebiotics" to make her "gut healthy" and were therefore the immediate causes of Plaintiff's decisions to purchase the Products.  Thus, Plaintiff Wheeler reasonably relied on Defendant's representations when she decided to purchase the Products.

93.    Plaintiff Wheeler did not receive the benefit of her bargain because the Products did not, in fact, contain enough "prebiotics" to achieve any meaningful "gut health."  As a result of Defendant's misrepresentations and omissions, Plaintiff Wheeler paid more money for the Products than she would have paid for other or a similar soda product that was not unlawfully labeled and was induced to purchase the Products because of the unlawful and misleading labeling.  Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff Wheeler would not have purchased them or, at minimum, would have paid less for them.

94.    Plaintiff Wheeler continues to desire to purchase soda products, including those marketed and sold by Defendant.  If the Products were reformulated and/or labeled without these unlawful and misleading claims, Plaintiff Wheeler would likely purchase the Products again in the future.  Plaintiff Wheeler regularly visits stores where the Products and other sodas are sold.

## CLASS ALLEGATIONS

95.    Plaintiffs bring this action on behalf of themselves and all other similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3) defined as (collectively, the "Classes"):

> **Nationwide Class:** All persons in the United States who, during the maximum period of time permitted by law, purchased Defendant's Products primarily for consumption. (the "Class").

**California Subclass:** All persons in California who, during the maximum period of time permitted by the law, purchased Defendant's Products primarily for consumption (the "California Subclass").

96.    The Class and Subclass does not include (1) Defendant, its officers, and/or its directors; (2) the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and family; and (4) Plaintiffs' counsel and Defendant's counsel.

97.    Plaintiffs reserve the right to amend the above class definitions and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

98.    ***Community of Interest***:  There is a well-defined community of interest among members of the Classes, and the disposition of the claims of these members of the Classes in a single action will provide substantial benefits to all parties and to the Court.

99.    ***Numerosity***:  While the exact number of members of the Classes is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, upon information and belief, members of the Classes number in the millions.  The precise number of the members of the Classes and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

100.    ***Existence and predominance of common questions of law and fact***:  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individuals of the Classes.  These common legal and factual questions include, but are not limited to:

(a)    Whether Defendant's Prebiotic Representations are false, misleading, deceptive, and/or unlawful;

(b)    Whether Defendant failed to disclose material facts about the Products;

(c)    Whether Defendant had a duty to disclose the risks associated with agave inulin;

(d)    Whether the Products posed a health risk;

(e)    Whether Defendant's representations and warranties were material;

(f)    Whether Defendant's advertising and marketing regarding the Products sold to Class members was likely to deceive reasonable consumers;

(g)     Whether labeling the Products with false and misleading claims causes them to command a price premium in the market as compared with similar products that do not make such misrepresentations;

(h)     Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

(i)     The amount of profits and revenues earned by Defendant as a result of the conduct;

(j)     Whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the Class;

(k)     Whether Plaintiffs and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages; and

(l)     Whether Class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief.

101.    With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*

102.    ***Typicality***:  The claims of the named Plaintiffs are typical of the claims of other members of the Classes in that the named Plaintiffs were exposed to Defendant's false and misleading marketing, purchased Defendant's deceptive Products, and suffered a loss as a result of those purchases.

103.    ***Adequacy***:  Plaintiffs will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4).  Plaintiffs are adequate representatives of the Classes because they have no interests adverse to the interests of the members of the Classes.  Plaintiffs are committed to the vigorous prosecution of this action, and, to that end, have retained skilled and experienced counsel.

104.    ***Superiority***:  A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because the expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek redress their claims other than through the procedure of a class action.  In addition, even if Class Members could afford individual litigation, the court system

could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system, resulting in multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presented fewer management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes. Plaintiffs anticipate no difficulty in the management of this action as a class action. Class-wide relief is essential to compel compliance with California's consumer protection laws. If separate actions were brought by individual members of the Classes, Defendant could be subject to inconsistent obligations.

## CAUSES OF ACTION

### COUNT I
**Violation of California's Consumers Legal Remedies Act ("CLRA"),
California Civil Code § 1750, *et seq.*
(On Behalf of Plaintiffs and the California Subclass)**

105. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

106. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

107. Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

108. Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

109. Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

110. Defendant violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by affirmatively

representing that the Product has prebiotic gut health benefits when it does not.

111. Defendant's wrongful business practices constituted, and still constitute, a continuing course of conduct in violation of the CLRA.

112. On or around January 23, 2024, Plaintiffs Lesh and Coleman put Defendant on notice of its false and deceptive labeling, advertising, marketing, and sale of the Poppi soda by sending Defendant a demand letter.  Despite receiving the aforementioned notice and demand, Defendant failed to do so in that, among other things, it failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy.

113. On May 28, 2024, prior to filing this action, Plaintiff Cobbs sent a pre-suit notice letter pursuant to CLRA § 1782.  The letter was sent certified mail, return receipt requested, and provided notice of Defendant's violation of the CLRA and demanded that Defendant correct the unlawful, unfair, false and/or deceptive practices alleged herein.

114. On July 19, 2024, Plaintiff Wheeler sent a pre-suit notice letter pursuant to CLRA § 1782.  The letter was sent certified mail, return receipt requested, and provided notice of Defendant's violation of the CLRA and demanded that within thirty (30) days from that date, VNGR correct, repair, replace or otherwise rectify the practices complained of herein.  The letter also stated that if VNGR refused to do so, a complaint seeking damages in accordance with the CLRA would be filed.

115. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated Subclass members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

116. Plaintiffs request that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs and the other members of the Subclass will continue to suffer harm. Plaintiffs and those similarly situated have no adequate remedy at law to stop Defendant continuing practices.

Plaintiffs also request that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

**COUNT II**
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
**(On Behalf of Plaintiffs and the California Subclass)**

117. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

118. The FAL makes it "unlawful for any person … to make or disseminate or cause to be made or disseminated before the public in this state, … [in] any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or those services, professional or otherwise, or … performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

119. Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Defendant committed acts of false and misleading advertising, as defined by the FAL, by using the above referenced Prebiotic Representations to promote the sale of its Products through online marketing and on the Products' packaging and labels. Despite those representations, however, the Products do not have any meaningful prebiotic effects on people's guts. Furthermore, Defendant omitted that consuming the Products poses a significant risk to the health and well-being of Plaintiffs and the California Subclass Members.

120. The misrepresentations by Defendant and the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et. seq.*

121. Defendant knew or should have known that its advertising claims are misleading and/or false.

122.    Defendant knew or should have known, through the exercise of reasonable care, that its representations were false and misleading and likely to deceive consumers and cause them to purchase Defendant's Products.

123.    Defendant's wrongful conduct is ongoing and part of a general practice that is still being perpetuated and repeated throughout the State of California and nationwide.

124.    Plaintiffs also seek equitable relief, including restitution, with respect to their FAL claims.  Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action will not succeed.  Plaintiffs and the California Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiffs may not be able to establish each California Subclass member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the FAL does not require individualized proof of deception or injury by absent class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'").  In addition, Plaintiffs and the California Subclass may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.  Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the risk of the agave inulin and cane sugar in the Products and its effects; or (2) the removal of Prebiotic Representations from the Products, will ensure that Plaintiffs and the California Subclass Members are in the same place they would have been in had Defendant's wrongful conduct not occurred, *i.e.*, the position to make an informed

decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at their disposal.

125.     Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they are not entitled.  Plaintiffs, and all those similarly situated consumers nationwide, have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## COUNT III
### Common Law Fraud, Deceit and/or Misrepresentation
### (On Behalf of Plaintiffs and the Class)

126.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

127.     Plaintiffs bring this claim under the laws of the State of California.

128.     Defendant has fraudulently and deceptively informed Plaintiffs that the Products are healthful sources of prebiotics, and marketed them as a good and/or fortified source of fiber.

129.     These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendant, not reasonably known to Plaintiffs, and material at the time they were made. Defendant knew or should have known the composition of the Products, the health impacts of the Products, and knew or should have known that the labeling of the Products as providing gut health benefits is misleading to consumers. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase the Products. In misleading Plaintiffs and not so informing Plaintiffs, Defendant breached its duty to them. Defendant also gained financially from, and as a result of, its breach.

130. Plaintiffs, and those similarly situated, relied to their detriment on Defendant's misrepresentations and fraudulent omissions. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

131. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, purchase the Products.

132. Plaintiffs and those similarly situated justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant.

133. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

134. Defendant's conduct as described herein was willful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

## COUNT IV
### Violation of California's Unfair Competition Law, ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.
### (On Behalf of Plaintiffs and the California Subclass)

135. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

136. The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act." Cal. Bus. & Prof. Code § 17200. A business act or practice is "unlawful" if it violates any established state or federal law. A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a

civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

137. Defendant's acts, as described above, constitute unlawful, unfair, and fraudulent business practices pursuant to California Business & Professions Code §§ 17200, *et seq*.

138. Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** through its violations of the FAL, Cal. Bus. & Prof. Code § 17500, *et seq.*; CLRA, Cal. Civ. Code § 1770(a)(5) and (a)(7); the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations, including but not limited to 21 C.F.R. as alleged above. 101.54, 21 C.F.R. 104.20, and 21 C.F.R. 101.65(d), which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

139. Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**. Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200, *et seq.* in that Defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct. Defendant's deceptive Prebiotic Representations have misled consumers into purchasing the Products over other truthfully labeled competitors. Furthermore, Defendant's omissions of fact regarding over consumption of agave inulin poses a significant risk to the health and well-being of Plaintiffs and the California Subclass

Members. Defendant has also engaged in unfair practices under the UCL by violating the FDA's policy against representing foods as good or fortified sources of fiber when they are not, as embodied in 21 C.F.R. § 101.54 and related regulations. In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, misrepresenting that the Products improve gut health, and are a good and/or fortified source of fiber.

140.    There were reasonably available alternatives to further Defendant's legitimate business interests, such as removing the Prebiotic Representations, disclosing the health risks of over consumption of agave inulin and cane sugar, or changing the Products' ingredients.

141.    Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices.**  Defendant's Prebiotic Representations and omissions of fact, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

142.    Plaintiffs and the other California Subclass members suffered a substantial injury by virtue of purchasing the Products as a result Defendant's unlawful, fraudulent, and unfair marketing, advertising, misrepresentations, and omissions about the true nature of the Products.

143.    There is no benefit to consumers or competition from Defendant's deceptive marketing and omitting material facts about the true nature of the Products.

144.    As a direct and proximate result of such actions, Plaintiffs and the other Subclass members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiffs and those similarly situated paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendant's misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, Plaintiffs, and those similarly situated, will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

145. As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

146. Plaintiffs and the other California Subclass members had no way of reasonably knowing that the Products Prebiotic Representations were false or that consuming too many of them poses a health risk. Thus, they could not have reasonably avoided the injury each of them suffered.

147. The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, and is substantially injurious to Plaintiffs and the other California Subclass members for the reasons set forth above.

148. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action will not succeed. Plaintiffs and the California Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiffs may not be able to establish each California Subclass member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL a claim for the entire class). In addition, Plaintiffs and the California Subclass may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith. Restitution and/or injunctive

relief may also be more certain, prompt, and efficient than other legal remedies requested herein. Plaintiffs and the Subclass lack an adequate remedy at law to obtain such relief with respect to their "unfairness" claims in this UCL cause of action, because there is no cause of action at law for "unfair" conduct. Plaintiffs and the Subclass similarly lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the Sherman Law (Articles 3 and 6) and the Federal laws and regulations referenced herein do not provide a direct cause of action, so Plaintiffs and the Subclass must allege those violations as predicate acts under the UCL to obtain relief.

149.    Accordingly, Plaintiffs seek, on behalf of themselves and those similarly situated, equitable relief, including restitution for the premium and/or the full price that they and others paid to Defendant as result of Defendant's conduct. Pursuant to California Business and Professional Code § 17203, Plaintiffs and the California Subclass members seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiffs and the other California Subclass members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs and the California Subclass members' attorneys' fees and costs.

150.    Plaintiffs also seek an injunction requiring an injunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein, including either (1) the removal of Prebiotic Representations from the Products or (2) adequate disclosure of the risk of the agave inulin in the Products and its effects. Defendant's misconduct, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with those laws.  This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.  The injunction requested will ensure that Plaintiffs and the California Subclass

Members are in the same place they would have been in had Defendant's wrongful conduct not occurred, *i.e.*, the position to make an informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at their disposal.

**COUNT V**
**Unjust Enrichment**
**(On Behalf Of The Nationwide Class)**

151.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

152.    Plaintiffs and the Class Members conferred benefits on Defendant by purchasing the Products.

153.    Defendant was unjustly enriched in retaining the revenues derived from Plaintiffs and the Class Members' purchases of the Products.  Retention of those monies under these circumstances is unjust and inequitable because Defendant misrepresented the benefits of the Products and failed to disclose their health risks.  These omissions and misrepresentations caused injuries to Plaintiffs and the Class Members because they would not have purchased the Products if the true facts were known.

154.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and the Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

155.    Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action will not succeed.  Plaintiffs and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the element required under unjust enrichment.  In addition, Plaintiffs and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because an action under unjust enrichment imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.  Restitution may also be

more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiffs and the Class are in the same place they would have been in had Defendant's wrongful conduct not occurred, *i.e.*, the position to make an informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at their disposal.  As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs and the Class Members suffered injury and seek the disgorgement and restitution of Defendant's wrongful profits, revenue, and benefits, plus interest, to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

## COUNT VI
### Breach of Express Warranty
### (On Behalf of the Nationwide Class)

156.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

157.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendant.

158.    Plaintiffs bring this claim under the laws of the State of California.

159.    As the manufacturer, marketer, advertiser, and promoter of the Products, Defendant issued an express warranty by representing that the Products have gut health benefit qualities via its prebiotics that it does not have.

160.    Defendant's representations were part of the basis of the bargains upon which the goods were offered for sale and purchased by Plaintiffs and the members of the Classes.

161.    As a direct and proximate result of Defendant's breach, Plaintiffs and the members of the Classes were injured because they: (1) paid money for the Products that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the Product they purchased was different than Defendant had advertised; and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than Defendant represented.  Had Defendant not breached its express warranty by making the false representations alleged herein,

Plaintiffs and the members of the Classes would not have purchased the Products or would not have paid as much as they did for them.

162.    As a result, Plaintiffs and the members of the Nationwide Class suffered and continue to suffer damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiffs as representative of the Classes; and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)    For prejudgment interest on all amounts awarded;

(e)    For an order of restitution and all other forms of equitable monetary relief;

(f)    For injunctive relief as pleaded or as the Court may deem proper; and

(g)    For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.


Dated: August 20, 2024                          Respectfully submitted,

                                                **BURSOR & FISHER, P.A.**


                                                By:    */s/ L. Timothy Fisher*

                                                L. Timothy Fisher (State Bar No. 191626)
                                                Joshua B. Glatt (State Bar No. 354064)
                                                1990 North California Blvd., Suite 940
                                                Walnut Creek, CA 94596
                                                Telephone: (925) 300-4455
                                                Facsimile:  (925) 407-2700
                                                E-mail: ltfisher@bursor.com
                                                        jglatt@bursor.com

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (*pro hac vice* forthcoming)
Benjamin Rozenshteyn (*pro hac vice* forthcoming)
140 Broadway, Suite 4667
New York, NY 10005
Telephone: (212) 884-4230
Facsimile:  (212) 884-4230
E-mail: adrian@gr-firm.com
         ben@gr-firm.com

*Attorneys for Plaintiff Kristin Cobbs*

**GUTRIDE SAFIER LLP**

*/s/ Anthony J. Patek*

Seth A. Safier (State Bar No. 197427)
Marie A. McCrary (State Bar No. 262670)
Anthony J. Patek (State Bar No. 228964)
100 Pine Street, Suite 1250
San Francisco, CA 94111
E-mail: seth@gutridesafier.com
         marie@gutridesafier.com
         anthony@gutridesafier.com

*Attorneys for Plaintiffs Carol Lesh and Sarah Coleman*

**KAPLAN FOX & KILSHEIMER LLP**

*/s/ Matthew B. George*

Laurence D. King (SBN 206423)
Mathew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
Clarissa R. Olivares (SBN 343455)
1999 Harrison Street, Suite 1560
Oakland, California 94612
Telephone: (415) 772-4700
Facsimile: (415) 722-4709
E-mail: lking@kaplanfox.com
         mgeorge@kaplanfox.com
         breed@kaplanfox.com
         colivares@kaplanfox.com

*Attorneys For Plaintiff Megan Wheeler*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher declare as follows:

1.    I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Kristin Cobbs in this action.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.    The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that Defendant regularly does business in San Francisco County, California, and a substantial portion of the events alleged in the Complaint, including the same misrepresentations, omissions, and injures alleged herein, have occurred in this County.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California, this 20th day of August 2024.


By:    _/s/ L. Timothy Fisher_____
                L. Timothy Fisher